## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| Era Polymers Proprietary Ltd., on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>BASF SE; BASF Corporation; Bayer A.G.; Bayer Corporation; Covestro AG; Covestro LLC; DowDuPont Inc.; The Dow Chemical Company; Huntsman International LLC; Wanhua Chemical Group Co., Ltd.; and Wanhua Chemical (America) Co., Ltd.<br><br>     Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Era Polymers Proprietary Limited brings this class action, on behalf of itself and all others similarly situated, against Defendants BASF SE, BASF Corporation, Bayer A.G., Bayer Corporation, Covestro AG, Covestro LLC, DowDuPont Inc., The Dow Chemical Company, Huntsman International LLC, Wanhua Chemical Group Co., Ltd., and Wanhua Chemical (America) Co., Ltd. (collectively, "Defendants") for damages and all other appropriate relief under the antitrust laws of the United States.  Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to itself.

2372450 v1

## INTRODUCTION

1.    Plaintiff alleges a conspiracy among Defendants and certain unnamed co-conspirators to fix, raise, maintain or stabilize prices for Isocyanates (as defined in this Complaint) sold in the United States, its territories and the District of Columbia.  This conspiracy constituted a *per se* violation of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3.

2.    Isocyanates—MDI and TDI—are key basic urethane materials used to manufacture various kinds of common polyurethanes used in a number of end-use applications.  TDI, for example, is the predominant Isocyanate used to produce flexible foam, which in turn is used in products like mattresses, car cushions and furniture.  MDI, for example, is the predominant Isocyanate used to produce rigid foam, which in turn is used in insulation for buildings and refrigerators, as well as coatings, adhesives and sealants.

3.    Starting no later than July 1, 2016 and continuing through the present (the "Class Period"), Defendants participated in a conspiracy to fix, stabilize, and artificially maintain prices for Isocyanates sold directly to Plaintiff and the other members of the proposed class (the "Class" or "class members").

4.    In late February of 2018 the United States Department of Justice's Antitrust Division ("DOJ") reportedly commenced a criminal investigation into Defendants for potential price-fixing of certain urethane chemicals, including one of

2

the two Isocyanates at issue in this case, MDI.  Several Defendants, including BASF and Covestro, have since confirmed that they have received grand jury subpoenas from the DOJ and are cooperating with the probe.

5.    Grand jury investigations conducted by the DOJ are criminal proceedings.    In determining whether to proceed with a civil or criminal investigation, the DOJ's policy, as stated in its Antitrust Division Manual, is "to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging, and customer and territorial allocations."

6.    The DOJ—"committed to prosecuting all matters of major significance"—considers a number of factors before opening a criminal investigation, including: "whether the allegations or suspicions of a criminal violation are sufficiently credible or plausible" based on legal authorities and the experience of high-level officials; "the nature of the conduct;" and "the degree of culpability of the conspirators (*e.g*., the duration of the conspiracy, the amount of overcharge, any acts of coercion or disciplining of cheaters)."   DOJ Antitrust Division Manual, Fifth Edition (last updated August 2017), Parts III.B, F.

7.    Spurred by news of this criminal government investigation, Plaintiff and its counsel immediately began investigating for itself and other members of the Class potential collusion among Defendants for the pricing of Isocyanates.  This

3

investigation has uncovered important facts in addition to the pendency of a criminal governmental investigation that, taken together, tend to show that Defendants participated in a price-fixing conspiracy for Isocyanates in the United States during the Class Period.

8.    *First*, after a multi-year period of stagnant pricing and relatively few attempts at announcing price increases, Defendants abruptly changed course by engaging in a pattern of announcing price increases frequently and in lockstep fashion, often in large amounts.

9.    *Second*, the prices that Class members paid for Defendants' Isocyanates increased during the Class Period at unprecedented rates and in unprecedented amounts. MDI prices increased during this relatively short time period by an average of 40%, and TDI prices increased during this period by an average of 95%.

10.    *Third*, as revealed by Plaintiff's economic analysis, the pricing of Isocyanates by Defendants during the Class Period cannot be fully explained by normal market forces, namely key input costs, supply and demand factors, and Defendants' capacity utilization rates.

11.    *Fourth*, the Isocyanates industry possesses all of the market characteristics—commodity-like products, highly concentrated oligopoly, high entry barriers, demand inelasticity, and ample opportunities to conspire—that are

4

widely recognized to enable and facilitate collusion in such a way that would inflict widespread harm on the Class.

12.    *Fifth*, some of the Defendants previously were found by a federal jury to have engaged in a price-fixing conspiracy for these very products, *i.e.*, the same kind of misconduct this Complaint alleges.  Indeed, Defendants' conduct bears remarkable resemblance to the scheme that BASF, Dow, Huntsman, and Covestro predecessor Bayer pursued from 2000 to 2003:  conspiring to issue lockstep price increase announcements and then working together to make them "stick" in the market. In 2013, a federal court entered judgment after trial against Dow for more than $1 billion for fixing the prices of urethane chemicals that included MDI and TDI, after Dow's co-defendants settled pre-trial for more than $139 million.  *See In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346 (D. Kan. May 15, 2013). Dow eventually settled that litigation for $835 million following the affirmance of the jury verdict by the United States Court of Appeals for the Tenth Circuit.

13.    In July 2016—the beginning of the Class Period—the *Polyurethane Daily* industry publication described a "tacit agreement on operation strategy" that had begun to emerge among MDI and TDI manufacturers: "firmness on price in spite of less delivery."  This theme—to hold prices high and refuse less profitable sales to keep volume low—is a hallmark of cartel behavior that characterizes the

5

MDI and TDI markets from 2016 to the present.  It is also remarkable recidivism.
In affirming the judgment against Dow, the Tenth Circuit observed that there was
"undisputed" evidence of collusive behavior by Dow, BASF, Bayer and Huntsman
that included coordinating price increase announcements and adopting a "'price over
volume strategy,' where the companies would stick to their list prices even if it meant
walking away from opportunities to earn business or make sales at lower, but still
profitable, prices." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir.
2014).

14.    Plaintiff brings this action on behalf of all persons and entities that
purchased Isocyanates in the United States and its territories directly from
Defendants during the Class Period.  As a result of Defendants' unlawful conduct,
Plaintiff and the Class (as defined in this Complaint) paid artificially inflated prices
for these products, and therefore have suffered injury to their business and property.

## JURISDICTION AND VENUE

15.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act,
15 U.S.C. §§ 15 and 26, to recover treble damages, costs of suit, reasonable
attorneys' fees, and all appropriate equitable and other relief for violations of
Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3.

6

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) as well as Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, because, during the Class Period, Defendants resided, transacted business, or were found or acted through subsidiaries or agents present in this District.  Additionally, a substantial part of the interstate commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had, and will have, substantial anti-competitive effects within this District.

18.     This Court has personal jurisdiction over each Defendant under 15 U.S.C. § 22 because, *inter alia*, each Defendant: (a) transacted business in this District; (b) sold Isocyanates in this District; (c) had substantial aggregate contacts with this District; and (d) committed in this District overt acts in furtherance of an illegal price-fixing conspiracy that was directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

19.    Plaintiff Era Polymers Proprietary Limited ("Plaintiff") is an Australian company with its principal place of business in New South Wales, Australia. Plaintiff also has offices in the United States in Texas, North Carolina, and Connecticut.  Plaintiff purchased Isocyanates in the United States directly from one or more of the Defendants during the Class Period.  As a result of Defendants' conduct, Plaintiff has suffered antitrust injury in the form of overcharges for Isocyanates.

## DEFENDANTS

20.    Defendant BASF SE is a German corporation with its principal place of business in Ludwigshafen, Germany.  BASF SE has extensive operations in the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates.    During the Class Period, BASF SE manufactured and sold Isocyanates to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries.

21.    Defendant BASF Corporation is a Delaware corporation with its principal place of business in Florham Park, New Jersey.  During the Class Period, BASF Corporation manufactured and sold Isocyanates to purchasers in the United States and elsewhere.  BASF Corporation is the North American affiliate of BASF SE.  BASF SE controls BASF Corporation both generally and with respect to the

8

conduct of BASF Corporation in furtherance of the unlawful acts alleged in this Complaint.  BASF SE and BASF Corporation are collectively referred to as "BASF."

22.    BASF has significant ties to this District.  In 2006, BASF relocated significant operations to Wyandotte, Michigan, after being offered a series of tax incentives.  BASF has emulsion and resin production facilities in Wyandotte, as well as pilot plant, research and development functions.

23.    Defendant Bayer A.G. is a German corporation with its principal place of business in Leverkusen, Germany.  Bayer A.G. has extensive operations in the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates.  During the Class Period, Bayer A.G. manufactured and sold Isocyanates to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

24.    Defendant Bayer Corporation is an Indiana corporation with its principal place of business in Pittsburgh, Pennsylvania.  Bayer Corporation is a wholly owned subsidiary of Bayer A.G.  During the Class Period, Bayer Corporation manufactured and sold Isocyanates to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.  Bayer A.G. controls Bayer Corporation both generally and with respect to the conduct of Bayer

Corporation in furtherance of the unlawful acts alleged in this complaint. Bayer A.G. and Bayer Corporation are collectively referred to as "Bayer."

25.    Defendant Covestro AG is a German corporation with its principal place of business in Leverkusen, Germany. Covestro AG was established as a legally independent company on September 1, 2015, but its roots can be traced back much earlier: it is the successor company to Bayer MaterialScience, Bayer AG's chemicals and plastics unit. Covestro AG has extensive operations in the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates. During the Class Period, Covestro AG manufactured and sold Isocyanates to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

26.    Defendant Covestro LLC is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. It is a wholly owned subsidiary of Covestro AG. On September 1, 2015, Covestro LLC was created as a spin-off from Bayer MaterialScience LLC, although it remained a wholly owned subsidiary of Bayer A.G. As of February 2017, Bayer A.G. held approximately 64% of Covestro LLC. As of September 2017, Bayer A.G. held less than 25% of Covestro LLC. Bayer A.G. sold its remaining interest in Covestro LLC in May 2018 (aside from Bayer's pension fund). During the Class Period, Covestro LLC manufactured and sold Isocyanates to purchasers in the United States and elsewhere. Covestro AG

controls Covestro LLC both generally and with respect to the conduct of Covestro LLC in furtherance of the unlawful acts alleged in this complaint. Covestro AG and Covestro LLC, along with the Bayer entities discussed above, are collectively referred to as "Covestro."

27.     Defendant DowDuPont Inc. is a Delaware corporation with its principal places of business in Midland, Michigan (for The Dow Chemical Company subsidiary) and in Wilmington, Delaware (for the E. I. du Pont de Nemours and Company subsidiary). DowDuPont Inc. was formed on August 31, 2017 as a result of a merger of equals between The Dow Chemical Company and E. I. du Pont de Nemours and Company. DowDuPont Inc. has extensive operations in the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates. On and after August 31, 2017, DowDuPont Inc. manufactured and sold Isocyanates to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

28.     Defendant The Dow Chemical Company is a Delaware corporation with its principal place of business in Midland, Michigan. On August 31, 2017, Dow became a wholly owned subsidiary of DowDuPont Inc. During the Class Period, Dow manufactured and sold Isocyanates to purchasers in the United States and elsewhere. DowDuPont Inc. and Dow are collectively referred to as "Dow."

11

2372450 v1

29.    Defendant Huntsman International LLC ("Huntsman") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Huntsman LLC is a wholly owned subsidiary of Huntsman Corporation.  During the Class Period, Huntsman LLC manufactured and sold MDI to purchasers in the United States and elsewhere.  Huntsman LLC is referred to as "Huntsman."

30.    Defendant Wanhua Chemical Group Co., Ltd. is a Chinese corporation with its principal place of business in Yantai, China.  Wanhua Chemical Group Co., Ltd. has extensive operations in the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates.  During the Class Period, Wanhua Chemical Group Co., Ltd. manufactured or sold Isocyanates to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

31.    Defendant Wanhua Chemical (America) Co., Ltd. is a Nevada corporation with its principal place of business in Newtown Square, Pennsylvania. It is a wholly owned subsidiary of Wanhua Chemical US Holding Inc.  During the Class Period, Wanhua Chemical (America) Co., Ltd. manufactured or sold Isocyanates to purchasers in the United States and elsewhere.  Wanhua Chemical Group Co., Ltd. and Wanhua Chemical (America) Co., Ltd. are collectively referred to as "Wanhua."

## CO-CONSPIRATORS

2372450 v1

32.    Various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

33.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

34.    Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including in this District.

35.    During the Class Period, Defendants' conduct that is the subject of this Complaint was within the continuous and uninterrupted flow of, and substantially affected, interstate trade and commerce.  This conduct included: (a) entering into and executing transactions for sale of Isocyanates that included purchasers and sellers from different states; (b) transferring or causing the transfer of money or payments across state lines in connection with sale of Isocyanates; and (c) selling Isocyanates in interstate commerce.

2372450 v1

## FACTUAL ALLEGATIONS

**A.    The Urethanes Industry**

**1.    Isocyanates**

36.    Isocyanates, both as used in this Complaint and more generally in the industry, are monomeric or polymeric diphenylmethane diisocyanates (MMDI or PMDI; collectively, MDI); toluene diisocyanates (TDI); and MDI-TDI blends. These types of Isocyanates are known as aromatic diisocyanates.

37.    Isocyanates, along with propylene oxide-based polyether polyols, are intermediate chemicals used in the manufacture of rigid and flexible foams, coatings, adhesives, sealants, and elastomers, among other applications.  Polyether polyols are combined with one of the Isocyanates to produce polyurethane polymers.

38.    MDI is a type of isocyanate used in combination with polyether polyols as a raw material for the production of rigid insulation foams and structural foams, among other applications.

39.    TDI is a type of isocyanate used in combination with polyether polyols as a raw material for the production of flexible foams for furniture, mattresses, packaging foam, and automobile seating, among other applications.

**2.    Relevant Industry Characteristics**

40.    Important characteristics of the MDI and TDI markets are such that they facilitate collusion among Defendants and promote the successful effects of that

2372450 v1

collusion, that is, the inflation of prices above competitive levels. These characteristics include: (1) standardized products with a high degree of interchangeability among producers; (2) a high degree of industry concentration; (3) significant entry barriers; (4) inelastic demand; and (5) the opportunity for inter-Defendant contacts.

### a.    Standardized Products

41.    A commodity-like product is one that is standardized across producers and allows for a high degree of substitutability among different producers in the same market.

42.    When purchasers consider a given product interchangeable, it is much easier for manufacturers to agree on prices for the relevant product and to monitor the pricing of that product effectively.

43.    MDI and TDI are each an undifferentiated commodity-like product. This means that customers decide which supplier's products to purchase primarily on the basis of price. By the same token, price is the primary means by which suppliers may compete for business.

### b.    Highly Concentrated Market

44.    A high degree of concentration facilitates the successful operation of a price-fixing conspiracy because it gives competitors transparency into one another's

production capabilities and capacity and makes it easier for competing producers to coordinate their behavior.

45.     Due to both a limited number of common manufacturers and a close correspondence in ownership of production of Isocyanates, the markets for these products are highly concentrated, with Defendants controlling nearly 100% of the domestic TDI and MDI markets.

46.     Defendants also collectively dominate the global markets for Isocyanates.   Together, they have over 90% of the world market for MDI by revenue.  According to a Deutsche Bank 2017 analyst report, Wanhua has 24% of the global MDI market by capacity; BASF has 21%; Covestro has 19%; Huntsman has 13%; and Dow has 9%.  In addition, these same firms (but for Huntsman) collectively possess about 63% of the global TDI market.  According to the same 2017 Deutsche Bank analyst report, BASF has 30% of the world TDI market by capacity; Covestro has 25%; and Wanhua has 8%.

47.     Because of their high collective market shares for each product, Defendants collectively are able to exercise market power, including the ability to raise prices and erect barriers to entry to the markets.

### c.     High Entry Barriers

48.     Artificially high pricing in a given market can attract new competitors, who want to take advantage of the high levels of profitability prevalent among

producers.  The presence of substantial entry barriers, however, makes entry much more difficult, and helps to facilitate the successful operation of a price-fixing conspiracy.

49.     There are high barriers to entry to the Isocyanate markets due to environmental laws and regulations and the capital-intensive nature of the business.

50.     It costs well into the hundreds of millions of dollars to build, never mind maintain and update, a single plant to manufacture either type of Isocyanate.  In 2017, Wanhua announced plans (as of yet unfulfilled) to build an MDI plant in Louisiana at a cost of $1.12 billion.

51.     Because the manufacture of Iscoyanates is an energy-intensive process that requires the utilization of large scale plants, the obtaining of patents or licenses for technology, assembling a workforce, obtaining a supply network, and investing in R&D, marketing and transportation capabilities, it is little wonder that there were no new entrants in the United States markets for MDI or TDI during the Class Period.

### d.    High Inelasticity of Demand

52.     Elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of a change in price of that product.  It measures how demand for a given product reacts to a change in that product's price.

53.     For a price-fixing conspiracy to profit from increasing prices above competitive levels, demand for the product must be sufficiently inelastic that any

17

loss in sales will be more than offset by increases in revenue on the sales that are obtained. Otherwise, increased prices would result in declining sales, revenues and profits, as customers would buy substitute products or stop purchasing altogether.

54.     Inelastic demand is an industry characteristic that facilitates successful collusion because it allows manufacturers to increase prices without causing customer substitution and lost sales revenue.

55.     There is high inelasticity of demand for Isocyanates. TDI and MDI are essential raw materials for the production of major polyurethane applications. Flexible and rigid foams, for instance, cannot be produced without TDI or MDI, respectively. This means that purchasers will not switch to alternative products because of a small but significant, non-transitory increase in the price of Isocyanates, thereby setting favorable conditions for successful implementation of a price-fixing agreement among Defendants.

56.     By the same token, there are no commercially viable substitutes for Isocyanates. Consequently, purchasers of these products had no choice but to pay the supracompetitive prices that Defendants charged them during the Class Period.

### e.     Opportunity to Conspire

57.     Defendants also had ample opportunity to conspire. They are members of many of the same chemical industry trade associations, including the American Chemistry Council ("ACC") and the International Isocyanate Institute ("III").

Indeed, Defendants are the only members of the Diisocyanate Panel of the ACC, and they also are members of the Center for the Polyurethanes Industry ("CPI") group of the ACC.

58.    Attendance by Defendants and their executives and managers at trade association meetings, such as those held by the ACC and the III, during the Class Period provided them the opportunity, and cover, to engage in anticompetitive conduct.

59.    For example, Defendants' representatives attended the following ACC-sponsored meetings during the Class Period:

- ACC annual meeting at The Broadmoor Resort in Colorado Springs, Colorado on June 6-8, 2016.

- CPI annual meeting at the Hilton Baltimore in Baltimore, Maryland on September 26-28, 2016.

- ACC annual meeting at The Broadmoor Resort in Colorado Springs, Colorado on June 5-7, 2017.

- CPI annual meeting at the New Orleans Marriott in New Orleans, Louisiana on October 4-7, 2017.

60.    Notably, this very industry already has been found to possess all of these market characteristics that facilitate cartel behavior.   In *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1264 (10th Cir. 2014), the Tenth Circuit, in

affirming a jury verdict in a case alleging a price-fixing conspiracy involving these Defendants (with the exception of Wanhua, which did not enter the U.S. market until later), held that the products were "homogenous," that market power "was concentrated in the hands of only a handful of firms," that "the market had high barriers to entry," that "there were no close substitutes available to consumers," and that this industry was "ripe for collusion." The presiding trial court further found that the conspirators participated in price-fixing discussions regarding Isocyanates during chemistry industry trade association meetings, including those sponsored by the ACC and the III. *See In re Urethane Antitrust Litig.*, 913 F. Supp. 1145 (D. Kan. 2012).

## B.    The Conspiracy

61.    From at least as early as July 1, 2016 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Isocyanates in the United States, its territories and the District of Columbia in unreasonable restraint of interstate trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

62.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged and to allocate customers and markets for Isocyanates in the United States.

63.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain or stabilize prices of Isocyanates in the United States;

b.     issuing price announcements consistent with, and selling Isocyanates at, the agreed upon prices in the United States;

c.     working together to ensure that the announced price increases "stuck" in the marketplace; and

d.     participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they had reached.

64.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise or stabilize prices of Isocyanates.

### 1.     Defendants Announced Frequent Parallel Price Increases

65.     Pursuant to and in furtherance of the conspiracy, Defendants announced market-wide price increases for Isocyanates close in time to each other and in similar or identical amounts.

66.     Defendants began issuing coordinated price increase announcements for Isocyanates at least as early as July 2016, the beginning of the Class Period. That

same month, *Polyurethane Daily* described a "tacit agreement on operation strategy" that had begun to emerge among MDI and TDI manufacturers: "firmness on price in spite of less delivery."

67. This theme—to refuse less profitable, but still profitable, sales in order to maintain higher prices—is a hallmark of cartel behavior that characterizes the MDI and TDI markets from 2016 to the present, and that also characterized those very markets nearly two decades ago, when Defendants similarly colluded. In affirming the judgment against Dow, the Tenth Circuit observed that there was "undisputed" evidence of collusive behavior by Dow, BASF, Bayer and Huntsman that included coordinating price increase announcements and adopting a "'price over volume strategy,' where the companies would stick to their list prices even if it meant walking away from opportunities to earn business or make sales at lower, but still profitable, prices." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014).

68. The following charts detailing certain market-wide Isocyanates price increase announcements of some of the Defendants (namely, BASF, Dow and Wanhua) to customers during the Class Period illustrate the frequency and extent of their parallel price increases:

eq

| MDI | | | |
|---|---|---|---|
| Announced Date | Effective Date | Amount | Defendant |
| Aug. 16, 2016 | Sept. 15, 2016 | $0.06/lb. | Wanhua |
| Aug. 22, 2016 | Sept. 15, 2016 | $0.06/lb. | Dow |
| | | | |
| Dec. 9, 2016 | Jan. 1, 2017 | $0.07/lb. | Dow |
| Dec. 16, 2016 | Jan. 16, 2017 | $0.07/lb. | BASF |
| Dec. 19, 2016 | Jan. 15, 2017 | $0.08/lb. | Wanhua |
| | | | |
| Jan. 20, 2017 | Feb. 15, 2017 | $0.06/lb. | Dow |
| Jan. 27, 2017 | Mar. 1, 2017 | $0.08/lb. | Wanhua |
| Feb. 13, 2017 | Feb. 13, 2017 | $0.10/lb. | BASF |
| | | | |
| Apr. 27, 2017 | May 15, 2017 | $0.13/lb. | BASF |
| May 1, 2017 | May 15, 2017 | $0.12/lb. | Wanhua |
| May 10, 2017 | May 15, 2017 | $0.12/lb. | Dow |
| | | | |
| Sept. 15, 2017 | Oct. 15, 2017 | $0.08/lb. | BASF |
| Sept. 22, 2017 | Oct. 15, 2017 | $0.08/lb. | Dow |
| | | | |
| Dec. 4, 2017 | Jan. 1, 2018 | $0.09/lb. | Dow |
| Dec. 12, 2017 | Jan. 1, 2018 | $0.08/lb. | BASF |
| TDI | | | |
| Announced Date | Effective Date | Amount | Defendant |
| July 6, 2016 | July 21, 2016 | $0.05/lb. | BASF |
| July 8, 2016 | July 8, 2016 | $0.05/lb. | Dow |
| July 11, 2016 | Aug. 1, 2016 | $0.05/lb. | Wanhua |
| | | | |
| Oct. 7, 2016 | Oct. 7, 2016 | $0.10/lb. | BASF |
| Oct. 11, 2016 | Oct. 11, 2016 | $0.10/lb. | Dow |
| Oct. 13, 2016 | Oct. 13, 2016 | $0.10/lb. | Wanhua |
| | | | |
| Dec. 27, 2016 | Dec. 27, 2016 | $0.10/lb. | Dow |
| Jan. 13, 2017 | Feb. 1, 2017 | $0.10/lb. | BASF |
| Jan. 23, 2017 | Feb. 15, 2017 | $0.10/lb. | Wanhua |

23

| | | | |
|---|---|---|---|
| Mar. 20, 2017 | Apr. 1, 2017 | $0.08/lb. | BASF |
| Mar. 21, 2017 | Mar. 21, 2017 | $0.10/lb. | Dow |
| | | | |
| May 1, 2017 | May 1, 2017 | $0.10/lb. | BASF |
| May 1, 2017 | May 15, 2017 | $0.10/lb. | Wanhua |
| | | | |
| June 5, 2017 | June 15, 2017 | $0.12/lb. | Dow |
| June 15, 2017 | June 15, 2017 | $0.10/lb. | Wanhua |
| June 19, 2017 | June 19, 2017 | $0.10/lb. | BASF |
| | | | |
| Aug. 4, 2017 | Aug. 15, 2017 | $0.08/lb. | Dow |
| Aug. 14, 2017 | Aug. 20, 2017 | $0.08/lb. | BASF |
| Aug. 15, 2017 | Aug. 15, 2017 | $0.08/lb. | Wanhua |
| | | | |
| Sept. 19, 2017 | Oct. 1, 2017 | $0.12/lb. | BASF |
| Sept. 22, 2017 | Oct. 1, 2017 | $0.12/lb. | Dow |
| | | | |
| Jan. 15, 2018 | Feb. 1, 2018 | $0.10/lb. | BASF |
| Jan. 24, 2018 | Feb. 1, 2018 | $0.10/lb. | Wanhua |
| | | | |
| Feb. 5, 2018 | Mar. 1, 2018 | $0.15/lb. | Dow |
| Feb. 9, 2018 | Mar. 1, 2018 | $0.10/lb. | Wanhua |
| Mar. 21, 2018 | Apr. 15, 2018 | $0.10/lb. | BASF |

69.    Price increase announcement letters that Huntsman and Covestro issued during the Class Period are not as readily publicly available as the letters for the other Defendants, some of which are noted in the charts above.  On information and belief, however, Huntsman and Covestro issued price increase announcement letters to their customers close in time to when the other Defendants issued letters and in identical or nearly identical amounts for the same or nearly contemporaneous effective dates.

70.     Huntsman has not published specific prices increase announcements for MDI during the Class Period (with the exception of one for MDI, which it published on May 31, 2018). But its earnings reports between 2016 and 2018, and its annual report for 2017, show that it raised prices on MDI sold in the United States and consequently gained increased revenue. Both in terms of timing and amount, these price increases mirrored those of the other Defendants. (Huntsman stopped manufacturing and selling TDI well before the Class Period began; in 2005, it sold that part of its Isocyanates business to BASF.)

71.     Similarly, Covestro has not published specific prices increase announcements for MDI or TDI during the Class Period, but its earnings reports and investor materials released during the Class Period show that it raised prices on both Isocyanates in the United States and thus gained increased revenue. Both in terms of timing and amount, these price increases mirrored those of the other Defendants

## 2.     <u>Prices Increased Significantly Market-Wide</u>

72.     Through their parallel price increase announcements and subsequent enforcement of these announcements, Defendants succeeded in significantly raising the prices that their customers paid for Isocyanates during the relevant period.

73.     Publicly available information confirms that the domestic prices for each Isocyanate increased significantly during the Class Period, and in stark contrast

to the generally flat to downward pricing trend for these products between 2014 and the first half of 2016.

74.    Covestro's 2015 annual report, for instance, stated that TDI prices dropped in 2014, and one of its investor presentations from May 2016 similarly indicated that its "EBIDTA margin" for Isocyanates "bottom[ed] out in 2014. Similar depressed pricing levels for Isocyanates occurred in 2015 and the first half of 2016.

75.    But beginning in the second half of 2016 and continuing into at least early 2018, prices began a precipitous climb.  Indeed, data from *ICIS*, a leading publisher of chemical industry news and market intelligence, shows that:

- MDI prices (cents/lb) increased from 134 in December 2016 to 187 as of April 2018 – a 40% increase; and

- TDI prices (cents/lb) increased from 136 in July 2016 to 265 as of April 2018 – a 95% increase.

76.    The following chart from *ICIS* illustrates the extent to which MDI prices increased during the Class Period compared to an earlier period:

2372450 v1



77.    Similarly, the following chart from *ICIS* illustrates the extent to which TDI prices increased during the Class Period compared to the prior period:



78. Other charts from *ICIS*, showing the pricing trends of both Isocyanates during much of the Class Period, indicate more of the same:



### 3. **Defendants' Price Increases Were Unprecedented**

79.    The prices for Defendants' Isocyanates increased at unprecedented rates and in unprecedented amounts.

80.    Indeed, in the Spring of 2017, direct purchaser Recitel noted the "unprecedented raw material [Isocyanate] price increases prevailing in the polyurethane industry."

81.    As *ICIS* reported in early 2018, "isocyanate buyers had little alternative but to accept consecutive rounds of price increases, with some sellers heard to have taken a 'take it or leave it' attitude towards their price increase initiatives, which would normally be at least partially negotiable."

82.    In a *Rubber & Plastics News* article from June 21, 2017—a time when pricing was still on a significant upward trajectory—an executive for Recitel commented that "[t]he rise is completely unprecedented in amplitude and speed." An executive for another direct purchaser, Vita Cellular Foams, echoed that sentiment: "We've been back in our records…. We've never seen anything like this duration.  We've seen these quantum of increases, but we've never seen these absolute prices before.  We have found six-month spikes, six-month drops, but nothing goes over a year."

4. **Defendants' Price Increases Cannot Be Explained by Ordinary Market Forces**

83.    Defendants' Isocyanate price increases cannot fully be explained by normal market forces, as Plaintiff has learned through independent economic investigation and analysis.

a. **Raw Material Costs Do Not Explain the Price Increases**

84.    *First*, the costs of the main raw materials for each Isocyanate—benzene for MDI and toluene for TDI (both of which are derived from crude oil)—did not increase in such a way during the Class Period that would justify the price increases observed for their corresponding Isocyanates.

85.    Crude oil prices are highly correlated with the main raw material costs for Isocyanates—benzene for MDI and toluene for TDI.   Crude oil prices were generally flat between the middle of 2016 and late 2017, despite substantial increases in MDI and TDI prices.   More generally, between 2016 and the present, the rate of increase in MDI and TDI prices has substantially exceeded the rate of increase in crude oil prices.  *ICIS* press releases concerning benzene and toluene during the Class Period also do not indicate any substantial cost increases that would explain the substantial increases in MDI and TDI prices during the Class Period.  Indeed, on July 27, 2016, near the conspiracy's outset, BASF noted the sluggishness in crude oil pricing and commented on "lower oil and gas prices"—the main raw materials for benzene and toulene—during an earnings call.

86.     Defendants themselves have recognized that raw material costs did not cause Isocyanate prices to increase during the Class Period.  During an interview in October 2016, Covestro's CEO said that "[r]aw material prices have been dropping and are now at a low level, so the margin expansion has come from relatively stable pricing but reducing raw material costs."  Huntsman's CEO and President echoed these sentiments, noting during a July 2016 investor call that his company's margin improvements was partially caused by a "20% drop in benzene raw material costs[.]"

### b.     Demand Does Not Explain the Price Increases

87.     *Second*, the relevant variables associated with measuring demand for Isocyanates did not substantially increase during the Class Period, and thus cannot explain the magnitude of these price increases.

88.     Demand, as measured by housing starts, automobile sales, furniture sales, and TDI exports, does not explain the escalation in prices of MDI and TDI. There is no indication of substantial increases in demand for these products between 2016 and the present.  Moreover, the rate of growth in demand during this period is similar to the rate of growth between 2014 and 2015—a period of flat pricing.

89.     The following charts show the disconnect between the above-referenced demand variables and Isocyanate prices during the Class Period and the years immediately preceding it:

2372450 v1





2372450 v1





90.     The bottom line is that there were no unusual increases in demand that would explain the substantial MDI and TDI price increases observed during the Class Period.

### c.     Capacity Utilization Rates Do Not Explain the Price Increases

91.     *Third*, global and domestic capacity utilization rates for MDI and TDI, respectively, remained virtually constant during the Class Period and the years leading up to it.  Thus, price increases of the type observed here cannot be explained by changes in capacity or capacity utilization rates during the period in question.

92.     The following tables, obtained from third-party reporting firm *Global QY Research*, show North American MDI and TDI capacity utilization rates, among other things, from 2013 to 2018:

Table 27.   North America Methylene Diphenyl Diisocyanate (MDI) Capacity, Production (Million Tons), Revenue (Billion USD), and Price (USD/Ton) (2013-2018)

| Parameter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Capacity | 0.9 | 1.0 | 1.0 | 1.1 | 1.2 | 1.3 |
| Production | 0.8 | 0.9 | 0.9 | 1.0 | 1.0 | 1.1 |
| Capacity Utilization Rate | 88.5% | 88.5% | 88.5% | 88.5% | 88.4% | 88.4% |
| Revenue | 2.36 | 2.52 | 2.70 | 2.88 | 3.08 | 3.29 |
| Price | 3289.4 | 3305.6 | 3321.4 | 3336.7 | 3351.4 | 3365.7 |

Source: Experts Interview, Secondary Sources and GQYR Chemical & Material Research Center, June 2018

Table 25.  North America Toluene Diisocynate (TDI) Capacity, Production (Million Tons), Revenue (Billion USD), and Price (USD/Ton) (2013-2018)

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Capacity | 0.37 | 0.40 | 0.42 | 0.45 | 0.48 | 0.51 |
| Production | 0.33 | 0.35 | 0.37 | 0.39 | 0.42 | 0.44 |
| Capacity Utilization Rate | 87.0% | 86.9% | 86.9% | 86.9% | 86.9% | 86.8% |
| Revenue | 0.95 | 1.01 | 1.08 | 1.15 | 1.23 | 1.31 |
| Price | 3230.7 | 3243.8 | 3255.9 | 3267.2 | 3277.5 | 3286.9 |

Source: Experts Interview, Secondary Sources and GQYR Chemical & Material Research Center, June 2018

93.    The following table, compiled from publicly available *ICIS* press releases, shows the relatively steady global capacity utilization rates for Isocyanates between 2013 and 2018:

|  | TDI | MDI |
|---|---|---|
| 2013 | 60% | 75% |
| 2014 | 60% | 77% |
| 2015 | 60% | 74% |
| 2016 | 61% | 75% |
| 2017 | 62% | 75% |
| 2018 | 63% | 73% |

**5.    Defendants' Collusion Padded Their Bottom Lines**

94.    As a result of these price increases, Defendants obtained record profits from the sale of polyurethane chemicals, particularly Isocyanates, during the Class Period.

95.    Huntsman exclaimed in its 2016 annual report that "our MDI EBIDTA increased by 9%" that year.

96.    The next year was similarly profitable for Huntsman.  In its 2017 annual report, Huntsman stated that "the increase in revenues in our Polyurethanes segment for 2017 compared to 2016 was primarily due to higher selling prices" and that "the increase in segment adjusted EBITDA was primarily due to higher MDI margins." And in a 2017 quarterly earnings call, Huntsman remarked that "[t]he increase in revenues in our Polyurethanes division for the three months ended December 31, 2016 compared to the same period in 2015 was primarily due to higher MDI average selling prices and higher MDI sales volume.

97.    Covestro, for its part, stated in its 2017 annual report that sales in its Polyurethanes segment had increased 29.2% compared to the prior year due in large part to "higher selling prices in Polyurethanes[.]"

98.    Dow too boasted in a first quarter 2018 earnings call that "Polyurethanes . . . benefitted from strong demand and price increases in downstream systems applications as well as from tight MDI fundamentals."

**6.    Defendants' Pricing Stabilized Soon After the DOJ Investigation Started**

99.    Soon after the DOJ reportedly initiated its criminal investigation and began subpoenaing Defendants (discussed below) in late February 2018, the pricing of Isocyanates began to stabilize (although it continued to remain at artificially high levels up to and through the present due to Defendants' conspiracy).

100.    Interestingly, on a February 23, 2018 analyst call—right around the time the DOJ began contacting Defendants—Huntsman CEO Peter Huntsman said that the company "expects that MDI prices will drop in the coming months, unless something unforeseen happens."

101.    Several days later, on February 26, 2018, *Urethanes Technology* reported that "Buyers say that pricing for both methyl di-phenylene isocyanate (MDI) and toluene di-isocyanate (TDI) has stabilized recently, with some participants even predicting price relief later in the year for these two commodities."

102.    Pricing for both Isocyanates remained relatively stable for approximately the next three months.  According to market participants, pricing then began to drop starting in around May of 2018, a trend that has continued to the present.

## GOVERNMENT INVESTIGATION

103.    The United States Department of Justice's Antitrust Division reportedly has been conducting a criminal price-fixing investigation into Defendants for certain urethane chemicals, including MDI, since late February of this year.

104.    On June 8, 2018, legal publication *MLex* first reported that "[m]anufacturers of a key ingredient for polyurethane-based coatings and other products are the targets of a criminal investigation into price-fixing."

2372450 v1

105.   "Methylene diphenyl diisocyanate, or MDI, is understood to be the focus of the investigation," *MLex* noted.  "The largest manufacturers of the product are Covestro and BASF in Germany, China's Wanhua Chemical, and the US companies Huntsman and Dow, which recently merged with DuPont."

106.   This publication further stated that "[t]he investigation into possible price-fixing of methylene diphenyl diisocyanate, or MDI, is in its early stages, with subpoenas being served on several companies at the end of February."

107.   Multiple Defendants have admitted to being contacted by the DOJ as part of its probe, as Plaintiff has learned from the initial and subsequent *MLex* articles and its own investigation.

108.   "'Covestro has been contacted by the U.S. Department of Justice regarding an investigation within the polyurethane industry.  We will fully cooperate with authorities throughout the investigation,' a company spokesperson told MLex."

109.   *MLex* further reported that "German chemical company BASF has acknowledged its involvement in a price-fixing investigation by the US Department of Justice involving a key ingredient used in manufacturing polyurethane."  "'The U.S. Department of Justice has issued a subpoena to BASF Corporation and several other companies related to an investigation the government is initiating involving producers of MDI and alleged violations of antitrust laws,' according to an emailed statement from a spokesperson for the company."

110.    The remaining Defendants, Dow, Huntsman and Wanhua, have neither confirmed nor denied publicly that they have been subpoenaed by the DOJ.

111.    The fact of a pending criminal investigation is important.    In determining whether to proceed with a civil or criminal investigation, the DOJ's policy, as stated in its Antitrust Division Manual, is "to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging, and customer and territorial allocations."

112.    Furthermore, the DOJ considers certain factors before opening a criminal investigation, including: "whether the allegations or suspicions of a criminal violation are sufficiently credible or plausible" based on legal authorities and the experience of high-level officials; "the nature of the conduct;" and "the degree of culpability of the conspirators (*e.g*., the duration of the conspiracy, the amount of overcharge, any acts of coercion or disciplining of cheaters)."    DOJ Antitrust Division Manual, Fifth Edition (last updated August 2017), Parts III.B, F.

## **PRIOR RELATED MISCONDUCT**

113.    This is not the first time Dow, Covestro (through its predecessor entity, Bayer), BASF and Huntsman have conspired to fix the price of Isocyanates.

114.    In February 2013, a federal jury in Kansas City, Kansas found Dow liable for participating in a price-fixing conspiracy for MDI and TDI (as well as other

39

urethane chemicals) from 2000 to 2003 with alleged co-conspirators Bayer, BASF,

Huntsman and Lyondell.  The jury found that the conspiracy harmed a certified class

of direct purchasers of these products in the amount of over $400 million, which the

court automatically trebled to approximately $1.2 billion before reducing it to $1.06

billion to account for pre-trial settlements Plaintiffs reached with the other

Defendants (see below).  *See In re Urethane Antitrust Litig.*, No. 04-1616-JWL,

2013 WL 2097346 (D. Kan. May 15, 2013).

115.   Bayer, BASF and Huntsman settled with the direct purchaser class

before trial for a total of $139 million.

116.   This $1.06 billion judgment, which the 10th Circuit Court of Appeals

affirmed in its entirety, *see In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir.

2014), is believed to be the largest price-fixing verdict ever issued under the

Sherman Act.  (Certain of the undersigned counsel for Plaintiffs served as court-

appointed co-lead counsel for the direct purchaser class in that case.)

## CLASS ACTION ALLEGATIONS

117.   Plaintiff brings this action on behalf of itself and as a class action under

the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of all members of the following Class:

> All persons and entities who purchased monomeric or
> polymeric diphenylmethane diisocyanates (MMDI or
> PMDI – collectively, MDI); toluene diisocyanates (TDI);
> or MDI-TDI blends directly from a defendant at any time

40

> from July 1, 2016 through the present ("Class Period") in the United States, its territories and the District of Columbia or for delivery in the United States, its territories and the District of Columbia (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates).

118.   Plaintiff does not know the exact number of class members because such information is in the exclusive control of Defendants.  But due to the nature of the trade and commerce involved, Plaintiff believes that there are hundreds of Class members as above described, the exact number and their identities being known by Defendants.

119.   The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

120.   There are questions of law or fact common to the Class, including:

a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy among themselves to fix, raise, maintain or stabilize prices of Isocyanates sold in the United States;

b.   The identity of the participants of the alleged conspiracy;

c.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.   Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

      e.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

      f.      The effect of the alleged conspiracy on the prices of Isocyanates sold in the United States during the Class Period; and

      g.      The appropriate class-wide measure of damages.

121.  Plaintiff is a member of the Class; Plaintiff's claims are typical of the claims of the Class members; and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff is a direct purchaser of Isocyanates, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

122.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

123.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

124.  The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including any legal and factual issues relating to liability and damages.

125.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one

for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action; indeed, a similar class action was successfully maintained and adjudicated involving these same products and many of these same defendants.

126.   Class certification is particularly appropriate in this case.  In 2008, the Honorable John Lungstrum of the United States District Court for the District of Kansas certified a class of direct purchasers of these Isocyanates (as well as other urethane chemicals) that alleged a price-fixing conspiracy between 1999 and 2004 among Dow, Bayer, BASF, Huntsman and Lyondell.  *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008).  In 2014, the 10th Circuit affirmed that class certification was appropriate after Dow challenged this and other issues following its loss at trial.  *See In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014).

## <u>EFFECTS</u>

127.   Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a.    Prices charged by Defendants to Plaintiff and the members of the Class for Isocyanates were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

b.    Plaintiff and the other members of the Class had to pay more for Isocyanates than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities; and

c.    Price competition in the sale of Isocyanates was restrained, suppressed or eliminated in the United States.

128.    As a direct and proximate result of Defendants' illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property in amounts to be determined.

## CLAIM FOR RELIEF

### COUNT I
### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

129.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

130.    Defendants and their co-conspirators engaged in a continuing combination and conspiracy to fix, raise, maintain, or stabilize the prices of Isocyanates sold in the United States, its territories and the District of Columbia that constituted a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

131.   Defendants and their co-conspirators agreed to, and did, restrain trade or commerce pursuant to this conspiracy by unlawfully raising and maintaining the prices for Isocyanates above competitive levels.

132.   In formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in price-fixing, the purpose and effect of which was to artificially raise or maintain the prices of Isocyanates.

133.   The illegal combination and conspiracy alleged herein had the following effects, among others:

a.   The prices at which Defendants sold Isocyanates to Plaintiff and members of the Class were artificially raised above competitive levels;

b.   Plaintiff and members of the Class have been deprived of free and open competition in the purchase of Isocyanates;

c.   Plaintiff and members of the Class have purchased Isocyanates for more than they would have in a competitive marketplace where Defendants' combination and conspiracy was absent; and

d.   Competition for the sale of Isocyanates has been unlawfully restrained.

134.   As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

2372450 v1

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

C.    That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

2372450 v1

July 30, 2018                                    Respectfully submitted,


                                                */s/ Patrick E. Cafferty*
Richard A. Koffman                              Patrick E. Cafferty
Jessica B. Weiner                               (Bar Number: P35613)
COHEN MILSTEIN SELLERS & TOLL,                  CAFFERTY CLOBES MERIWETHER &
PLLC                                            SPRENGEL LLP
1100 New York Avenue, NW, Suite                 220 Collingwood Drive, Suite 130
500                                             Ann Arbor, MI 48103
Washington, DC 20005                            Tel: (734) 769-2144
Tel: (202) 408-4600                             pcafferty@caffertyclobes.com
rkoffman@cohenmilstein.com
jweiner@cohenmilstein.com
                                                Ellen Meriwether
                                                CAFFERTY CLOBES MERIWETHER &
Christopher J. Cormier                          SPRENGEL LLP
COHEN MILSTEIN SELLERS & TOLL,                  1101 Market Street, Suite 2650
PLLC                                            Philadelphia, PA 19107
5290 Denver Tech Center Parkway                 Tel: 215.864.2800
Greenwood Village, CO 80111                     emeriwether@caffertyclobes.com
Tel: (720) 630-2092
ccormier@cohenmilstein.com
                                                Jeffrey B. Gittleman
                                                Chad Carder
Sharon K. Robertson                             BARRACK, RODOS & BACINE
COHEN MILSTEIN SELLERS & TOLL,                  3300 Two Commerce Square
PLLC                                            2001 Market Street
88 Pine Street, 14th Floor                      Philadelphia, PA 19103
New York, NY 10005                              Tel: (215) 963-0600
Tel: (212) 838-7797                             jgittleman@barrack.com
srobertson@cohenmilstein.com                    ccarder@barrack.com


Warren T. Burns                                 Michael J. Boni
Will Thompson                                   Joshua D. Snyder
BURNS CHAREST LLP                               BONI, ZACK & SNYDER LLC
900 Jackson Street, Suite 500                   15 St. Asaphs Road
Dallas, TX 75201                                Bala Cynwyd, PA 19004
Tel: (469) 904-4550                             Tel: (610) 822-0200
wburns@burnscharest.com                         mboni@bonizack.com
wthompson@burnscharest.com                      jsnyder@bonizack.com

2372450 v1

Korey Nelson
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Tel: (504) 799-2845
knelson@burnscharest.com

*Counsel for Plaintiff Era Polymers Proprietary Limited*

48